# **EXHIBIT A**

Case 3:14-cv-05738-MAS-LHG   Document 19-3   Filed 11/07/14   Page 2 of 17 PageID: 134

Filed in Douglas District Court
*** EFILED ***
Case Number: D01CI140006766
Transaction ID: 0001566748
Filing Date: 08/21/2014 10:49:11 AM CDT

IN THE FOURTH JUDICIAL DISTRICT COURT OF NEBRASKA

| | |
|---|---|
| JAY ZOLA and JEREMIAH JOSEPH LOWNEY,<br><br>　　　　　　Plaintiffs,<br><br>　　vs.<br><br>TD AMERITRADE, INC., TD AMERITRADE CLEARING, INC.,<br><br>　　　　　　Defendants. | CASE NO. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jay Zola and Jeremiah Joseph Lowney ("Plaintiffs"), on their own behalf and on behalf of a class of those similarly situated (the "Class," further defined below), allege as follows against Defendants TD Ameritrade, Inc. and TD Ameritrade Clearing, Inc. (collectively, "TD Ameritrade" or the "Company"). Plaintiffs' allegations are made upon personal knowledge as to their own acts and experiences, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' counsel, which included, among other things, a review of public documents.

I.　　**INTRODUCTION**

> *The average investor has no hope of knowing, of course, even the little he needs to know. He logs onto his TD Ameritrade or E\*Trade or Schwab account, enters a ticker symbol of some stock, and clicks an icon that says 'Buy': Then what? He may think he knows what happens after he presses the key on his computer keyboard, but trust me, he does not. If he did, he'd think twice before he pressed it.*

　　– Michael Lewis, Flash Boys: A Wall Street Revolt (2014)

1. TD Ameritrade is one of the largest retail brokers in the United States. In its uniform agreement with each of its clients (the "Client Agreement"), TD Ameritrade

1

promises to "consider a wide variety of factors in determining where to direct [client] orders, such as execution price, opportunities for price improvement (which is when an order is executed at a price that is more favorable than the displayed national best bid or offer), market depth, order size and trading characteristics of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, accuracy of executions, and the cost of executing orders at a market."

2. TD Ameritrade has blatantly breached this contractual duty. TD Ameritrade neither "consider[s] a wide variety of factors" in order-routing nor routes its orders in the manner that is best for its customers. Rather, as one of its own executives admitted in testimony before the United States Senate, TD Ameritrade routes "virtually all" of its orders based on a single factor: what's best for TD Ameritrade. That is, the TD Ameritrade executive admitted (and the data confirms) that TD Ameritrade has been routing virtually all of its customers' orders through whichever order internalizer[1] or exchange is willing to pay TD Ameritrade the most money to receive its order flow. In turn, those order internalizers and exchanges expose TD Ameritrade's customers to toxic trading.

3. TD Ameritrade calls the kickbacks that it receives from order internalizers and exchanges "payment for order flow." In 2013, the Company earned $236 million from this practice.

---

[1] Order internalizers are market makers who match some orders internally (either for their own book or for other market participants) before directing orders to public exchanges. As set forth in greater detail below, the primary order internalizers to whom TD Ameritrade directs its order flow are Citadel Execution Services and Citi Global Markets, a subsidiary of Citigroup, Inc.

## II. PARTIES

4. Plaintiff Jay B. Zola is, and at all relevant times was, a resident of Mansfield, Massachusetts. At all relevant times, Zola was a customer of TD Ameritrade and was a party to the standard Client Agreement. Zola executed approximately nine stock sales through TD Ameritrade Clearing Inc. between February 29, 2012 and November 12, 2012.

5. Plaintiff Jeremiah Joseph Lowney is, and at all relevant times was, a resident of Milton, Massachusetts. At all relevant times, Lowney was a customer of TD Ameritrade and a party to the standard Client Agreement. Lowney executed approximately four stock purchases or sales through TD Ameritrade, Inc. between May 21, 2012 and July 2, 2012.

6. Defendant TD Ameritrade, Inc. is a corporation. It is an SEC-registered broker-dealer with a headquarters in Omaha, Nebraska. TD Ameritrade, Inc. is a wholly owned subsidiary of TD Ameritrade Holding Corporation.

7. Defendant TD Ameritrade Clearing, Inc. is a corporation with a headquarters in Omaha, Nebraska. TD Ameritrade Clearing, Inc. provides trade execution and clearing services to TD Ameritrade Inc. TD Ameritrade Clearing, Inc. is an indirect wholly owned subsidiary of TD Ameritrade Holding Corporation.

## III. JURISDICTION AND VENUE

8. Venue is proper in this Court because Defendants have their corporate headquarters in this District. The Client Agreement is governed by Nebraska law.

9. This Court has personal jurisdiction over Defendants because they are corporations with headquarters in Nebraska and the Client Agreement provides for "the

jurisdiction of and venue within the State of Nebraska for all disputes arising out of or relating to this agreement."

10. This claim is a putative class action. Therefore, it is not subject to arbitration under the terms of the Client Agreement, which provides that "[n]o person will bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action[.]"

IV.     **SUBSTANTIVE ALLEGATIONS**

    A.     **High-Frequency Traders Pay to Trade With "Dumb Money"**

11. In recent years, high frequency traders have come to dominate stock trading in the United States. High frequency traders use a combination of sophisticated computer algorithms, ultra-low-latency fiber-optic communication networks, and privileged physical locations next to stock exchange servers to trade on information at a speed that other market participants are physically incapable of matching. For example, a popular high frequency trading strategy is known as electronic front-running. In this strategy, high frequency traders learn of increased demand/supply for a given stock by seeing a bid or offer on one exchange or other market venue. Almost immediately—and effectively simultaneously from the perspective of other market participants—high frequency traders react to the initial bid/offer by buying/selling on other exchanges or through other venues and then immediately transacting with the initial bidder/offeror at a now-inflated/deflated price.

12. This strategy and others like it enable high frequency traders to earn effectively riskless profits at the expense of their counterparties. For example, according to its March

10, 2014, Form S-1, the high-frequency trading firm, Virtu Financial, Inc. ("Virtu") had "*only one losing trading day*" during the period between January 1, 2009 and December 31, 2013. During that same 1,238 trading-day period, there were only fourteen days in which Virtu earned less than $800,000 in net trading income.

13. Individual investors are particularly likely to be harmed by exposure to high frequency traders. In essence, the risk of any given trade increases as the information gap between counterparties widens. Retail investors are usually the least informed market participants. And because they get their information sooner than anyone else, high frequency traders are almost always the best-informed market participants.

14. For example, consider the situation of a retail investor who places a limit order.[2] After that order is placed and before it is filled, the market will move in one direction or another. Thus, before deciding whether it wants to trade with the retail investor, a high frequency trader will see that the market is moving against the order (*i.e.*, the retail investor was wrong about the direction of the price) or in favor of the order (*i.e.*, the retail investor was right about the direction of the price). If the market moves against the order, the high frequency trader will trade with the retail investor and lock in a quick profit by exploiting the difference between the investor's order and the market price. If the market moves with the order, the high frequency trader will decline to trade and the retail investor's order is less likely to get filled. This is called the "adverse selection" effect: orders where the retail investor guesses wrong are more likely to be filled than orders where the retail investor guesses right.

---

[2] A buy "limit" order is an order to buy a particular stock at or below a specified price. Similarly, a sell "limit" order is an order to sell a particular stock at or above a specified price. By contrast, a "market" order is an order to buy or sell a particular stock at the current market price, whatever that may be.

5

15. Exposure of retail order flow to high frequency traders is, therefore, widely considered to be toxic to retail investors. In an April 3, 2014 statement, the retail brokerage firm Charles Schwab issued a statement calling high frequency trading a "growing cancer" and stating that "individual investors are now pawns in a bigger chess game." The Schwab statement explained that "the practice of selling preferential access or data feeds and … order types that allow high-frequency traders to jump ahead of legitimate order flow … are all simply tools for scamming individual investors."

16. In a December 2008 white paper, Themis Trading LLC (an institutional agency broker) explained that "High frequency trading strategies have become a stealth tax on retail and institutional investors. While stock prices will probably go where they would have gone anyway, toxic trading takes money from real investors and gives it to the high frequency trader who has the best computer. The exchanges, ECNs and high frequency traders are slowly bleeding investors, causing their transaction costs to rise, and the investors don't even know it."

17. Similarly, a November 2012 study, "The Trading Profits of High Frequency Traders" by, among others, Andre Kirilenko of the Commodity Futures Trading Commission ("CFTC") found that "[s]mall traders in particular suffer the highest short-term losses to [high frequency traders] on a per contract basis."

18. Conversely—and unsurprisingly—high frequency traders are eager to trade with retail investors. In a December 17, 2010 report entitled "For Wall Street, dumb money pays," Reuters explained:

> Individuals, or 'retailers' as they're called, are desirable trading counterparties for the pros because they're relatively small and … often make longer-term trades based on headline news and a 'feeling' about a stock.

6

> Unlike pension funds, they don't have millions or billions of investment dollars that could drastically move market prices and steamroll a market maker that gets in the way. Three hundred shares of Bank of America is barely a blip in a market that absorbs tens of thousands of orders a second.
>
> And in contrast to high-frequency traders, retailers don't have reams of algorithmic code and rapid-fire trading software that often shows where stocks are headed in the next few milliseconds.

19. Over the past decade, a significant market has developed for selling retail order flow—"dumb money" in industry parlance—to high frequency traders who pay for the opportunity to exploit less sophisticated investors. Particularly significant in this pay-to-prey market are order internalizers—a species of high frequency trader—who pay retail brokerages to route their customers' order flow through the order internalizer. After receiving retail orders, the order internalizers (i) trade directly against those retail orders (usually the most attractive orders) for their own book; (ii) direct retail orders to an "internalization pool," in which other market participants (usually other high frequency traders) can trade against the retail orders; or (iii) direct the least-attractive retail orders (*i.e.*, those orders most likely to be profitable for the retail investor) to a public exchange—where those orders are now several milliseconds late.

20. In the market for retail order flow, the retail brokers win because they get paid for routing their order flow to the highest bidder. The order internalizers win because they get to trade against "dumb money" for their own book and attract business from other high frequency traders by selling access to the remaining retail order flow in internalization pools. The other high frequency traders win because they get to exploit uninformed retail orders in internalization pools. The only losers are the retail investors who are exposed to adverse selection risk as well as electronic front-running, and other toxic high-frequency trading strategies.

### B. TD Ameritrade Has Been Earning Hundreds of Millions of Dollars By Selling Its Order Flow to the Highest Bidder, In Breach of the Client Agreement

21. TD Ameritrade is the third largest retail broker in the United States, smaller only than Schwab and E*Trade Financial Corp. ("E*Trade"). In 2013, TD Ameritrade executed over 92 million trades. At the end of 2013, TD Ameritrade had over 5.9 million funded client accounts with collective assets over $555 billion.

22. Plaintiffs and other TD Ameritrade clients all executed a uniform contract with TD Ameritrade called the Client Agreement.[3] Under the terms of the Client Agreement, TD Ameritrade promises to "consider a wide variety of factors in determining where to direct [client] orders, such as execution price, opportunities for price improvement (which is when an order is executed at a price that is more favorable than the displayed national best bid or offer), market depth, order size and trading characteristics of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, accuracy of executions, and the cost of executing orders at a market."

23. The Client Agreement further provides that the Agreement "will be governed by the laws of the State of Nebraska, but not its conflicts of laws provisions."

24. TD Ameritrade has breached this agreement with Plaintiffs and the Class. Rather than "consider a wide variety of factors" in its order routing, TD Ameritrade has, for many years, simply sold its order flow to the highest bidder. In the process, it has knowingly exposed its customers' orders to toxic high frequency trading.

---

[3] A copy of the latest version of the Client Agreement is attached hereto as Exhibit A. Upon information and belief, earlier versions of the Client Agreement contain the same or substantially similar language regarding factors that TD Ameritrade will consider in order routing.

8

25. In his 2014 book, *Flash Boys*, the journalist Michael Lewis quoted extensively from conversations with Chris Nagy—the former head of order routing at TD Ameritrade who left in 2012. Nagy told Lewis that when TD Ameritrade sold its order flow, it did so under conditions of extraordinary secrecy. "Most of the deals tend to be handshake deals … payment for the order flow is as off-the-record as possible. They never had an email or even a phone call. You had to fly down to meet[.]"

26. Nagy confirmed that TD Ameritrade knew its customers' order flow was particularly vulnerable to high frequency traders:

> What Nagy did know was that the simple retail stock market order was, from the point of view of high-frequency traders, easy kill. 'Whose order flow is the most valuable?' [Nagy] said. 'Yours and mine. We don't have black boxes. We don't have algos. Our quotes are late to the market—a full second behind.'
>
> High-frequency traders sough to trade as often as possible with ordinary investors, who had slower connections. They were able to do so because the investors themselves had only the faintest clue of what was happening to them[.]

27. In testimony before a Senate committee on June 17, 2014, a senior executive at TD Ameritrade, Steven Quirk, was questioned by Senator Carl Levin. In that testimony, Mr. Quirk effectively conceded that—as Mr. Nagy suggested—payment-for-order-flow payments overrode every other factor in TD Ameritrade's order routing decisions. As recounted by the New York Times:

> So, again, your subjective judgment as to which market provided best execution for tens of millions of customer orders virtually always led you to route orders to the markets that paid you the most?" Mr. Levin asked.
>
> "No, not always led us …" Mr. Quirk began.
>
> "I said 'virtually always,' " Mr. Levin responded.
>
> After a short pause, Mr. Quirk said, "Virtually, yeah."

9

28. Reports that TD Ameritrade has filed with the Securities and Exchange Commission, pursuant to SEC Rule 606, confirm that TD Ameritrade routes almost all of its customers' orders to order internalizers or exchanges that pay TD Ameritrade for its order flow.[4]

29. For example, in the first quarter of 2014, TD Ameritrade, Inc. routed 92% of orders for New York Stock Exchange ("NYSE")-listed securities to just two order internalizers and one exchange, each of which pays TD Ameritrade for its order flow: Direct Edge, Citadel Execution Services, and Citi Global Markets.

| Securities Listed on the NYSE Euronext | | | | |
|---|---|---|---|---|
| | Order Percentage Statistics | | | |
| Routing Venue | Total Orders (%) | Market Orders (%) | Limit Orders (%) | Other Orders (%) |
| Direct Edge | 40% | 0% | 47% | 1% |
| Citadel Execution Services | 35% | 55% | 30% | 86% |
| Citi Global Markets | 17% | 26% | 16% | 8% |

30. The same pattern held true in prior quarters. In the fourth quarter of 2013, Direct Edge, Citadel Execution Services and Citigroup—each of which paid for order flow—received 94% of TD Ameritrade, Inc.'s orders for NYSE-listed securities:

| Securities Listed on the NYSE Euronext | | | | |
|---|---|---|---|---|
| | Order Percentage Statistics | | | |
| Routing Venue | Total Orders (%) | Market Orders (%) | Limit Orders (%) | Other Orders (%) |
| Direct Edge | 39% | 1% | 47% | 1% |
| Citadel Execution Services | 36% | 58% | 32% | 74% |
| Citigroup | 19% | 30% | 17% | 21% |

31. In the third quarter of 2013 those same three firms paid for order flow and received 95% of all orders for NYSE-listed securities:

---

[4] The Client Agreement states that TD Ameritrade may "receive remuneration from markets for directing orders to them." But the Agreement does not permit TD Ameritrade to allow those payments to be the overriding factor in its order-routing decisions.

10

| Securities Listed on the NYSE Euronext | | | | |
|---|---|---|---|---|
| | Order Percentage Statistics | | | |
| Routing Venue | Total Orders (%) | Market Orders (%) | Limit Orders (%) | Other Orders (%) |
| Direct Edge | 38% | 0% | 45% | 1% |
| Citadel Execution Services | 37% | 64% | 32% | 62% |
| Citigroup | 20% | 30% | 18% | 33% |

32. As Senator Levin stated, it is "hard to believe that [it] is just a coincidence" that TD Ameritrade's "subjective judgment as to which trading venue provides best execution … always just happens to also result in the biggest payment" to TD Ameritrade.

### C. TD Ameritrade Has Been Wrongfully Enriched By Its Breach of Contract

33. As set forth above, TD Ameritrade has profited handsomely by routinely breaching its promise to consider a "wide variety of factors" in order-routing in favor of simply selling its order flow to the highest bidder. In 2013, the Company earned $236 million in payment-for-order-flow revenue. In 2012, the Company earned $184 million in payment-for-order-flow revenue. And in 2011, the Company earned $185 million in payment-for-order-flow revenue.

34. Plaintiffs and the Class are entitled to disgorgement of TD Ameritrade's profits from these material and opportunistic breaches of contract. *See, e.g.*, Restatement of the Law, Third, (Draft No. 4) § 39(1) ("If a breach of contract is both material and opportunistic, the injured promisee has a claim in restitution to the profit realized by the defaulting promisor as a result of the breach. Liability in restitution with disgorgement of profit is an alternative to liability for contract damages measured by injury to the promisee.").

11

> D. **Plaintiffs and the Class Have Been Damaged By TD Ameritrade's Breach of Contract**

35. TD Ameritrade's breaches of contract have caused economic injury to Plaintiffs and the Class, in an amount to be determined at trial, insofar as Plaintiffs and the Class have been exposed to toxic high-frequency trading and the associated adverse selection risk and increased risk of electronic front-running as well as other predatory high frequency trading strategies. Plaintiffs and the Class have been further damaged because they have not received the best execution on their trades, but rather the execution that was best for TD Ameritrade.

## V. CLASS ALLEGATIONS

36. Plaintiffs bring this action on behalf of themselves and the following Class, pursuant to Neb. Rev. Stat. § 25-319:

> All customers of TD Ameritrade, Inc. or TD Ameritrade Clearing, Inc. who placed a non-directed order with TD Ameritrade, Inc. or TD Ameritrade Clearing, Inc. on or after the date that is five years prior to the filing of this Complaint.

37. The Class excludes TD Ameritrade's officers and directors, current or former employees, as well as their immediate family members. Plaintiffs and the Class do not assert claims for breach of fiduciary duty, misrepresentation, or violations of the federal securities laws.

38. Plaintiffs reserve the right to amend the definition of this proposed Class, including by adding subclasses.

39. The Class is so numerous that joinder of all members is impracticable. The precise number and identity of class members can be ascertained from the records of TD Ameritrade.

40. There are question of fact or law common to the Class. These questions include, but are not limited to:

    a. Whether a contract existed between TD Ameritrade and members of the Class;

    b. Whether TD Ameritrade agreed to "consider a wide variety of factors in determining where to direct [client] orders, such as execution price, opportunities for price improvement (which is when an order is executed at a price that is more favorable than the displayed national best bid or offer), market depth, order size and trading characteristics of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, accuracy of executions, and the cost of executing orders at a market";

    c. Whether TD Ameritrade, in fact, considered a wide variety of factors in determining where to direct client orders;

    d. Whether Class members are entitled to damages;

    e. Whether Class members are entitled to injunctive and/or declaratory relief.

41. Plaintiffs' claims are typical of the Class and Plaintiff is not subject to any unique defenses.

42. Plaintiffs will fairly and adequately protect the interest of the Class. Plaintiffs' interests do not conflict with the interests of the Class. Plaintiffs have retained competent counsel experienced in class action litigation of this type. Plaintiffs' counsel will fairly and adequately protect the interests of the Class.

43. Certification is appropriate because questions of law or fact common to the Class predominate over any questions affecting only individual members. Certification is also appropriate because TD Ameritrade has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the Class members as a whole is appropriate.

44. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual lawsuits are economically infeasible and procedurally impracticable. Plaintiffs know of no difficulty to be encountered in the management of this case that would preclude its maintenance as a class action.

## VI. CLAIMS ALLEGED

### COUNT ONE
### BREACH OF CONTRACT

45. Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

46. Plaintiffs and the Class executed written contracts with TD Ameritrade (the "Client Agreement"), a copy of which is attached hereto as Exhibit A, and exchanged valuable consideration therein.

47. Pursuant to the terms of the Client Agreement, TD Ameritrade promised to "consider a wide variety of factors in determining where to direct [client] orders, such as execution price, opportunities for price improvement (which is when an order is executed at a price that is more favorable than the displayed national best bid or offer), market depth, order size and trading characteristics of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, accuracy of executions, and the cost of executing orders at a market."

48. TD Ameritrade has committed a material breach of this promise. Rather than consider a wide variety of factors in order routing, TD Ameritrade sends virtually all of its customers' orders to the order internalizer or exchange that pays TD Ameritrade the most money for its order flow.

14

49. TD Ameritrade has earned significant, wrongful profits from these material and opportunistic breaches. Plaintiffs and the Class have been damaged thereby, in an amount to be determined at trial.

## VII. RELIEF SOUGHT

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment in their favor as follows:

A. Certify this matter as a class action, appoint Plaintiffs' attorneys as class counsel, and issue notice to the Class;

B. Enter judgment in favor of Plaintiffs and the Class against the Defendants;

C. Grant appropriate declaratory and injunctive relief against Defendants;

D. Award to Plaintiffs and Class members restitutionary damages by requiring Defendants to disgorge the profits they have earned from their material and opportunistic breaches of contract;

E. Award to Plaintiffs and Class members their expectation damages;

F. Grant an award of reasonable attorney's fees and other litigation costs reasonably incurred, including expert witness fees; and

G. Award any and all other relief to which Plaintiff and the Class may be entitled.

## VIII. JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  August 12, 2014

                Respectfully submitted,

BY: _____
Matthew A. Lathrop, #19558
LAW OFFICE OF MATTHEW A. LATHROP, PC, LLO
2215 Harney Street, Suite 200
Omaha, NE  68102
(402) 614-7744 telephone
(402) 614-6960 facsimile
ATTORNEY FOR PLAINTIFF

Jeffrey C. Block
Joel A. Fleming
Block & Leviton LLP
155 Federal Street
Boston, Massachusetts  02110
Tel:  (617) 398-5600
Fax:  (617) 507-6020
Jeff@blockesq.com
Joel@blockesq.com