# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TYLER VERDIECK, A California Citizen, Individually And On Behalf Of All Others Similarly Situated, | ) ) ) | CASE NO: _____ |
| | ) | **CLASS ACTION COMPLAINT FOR:** |
| Plaintiff, | ) ) | **(1) VIOLATION OF FIDUCIARY DUTIES AND THE DUTY OF** |
| vs. | ) ) | **BEST EXECUTION,** |
| | ) | **(2) DECLARATORY RELIEF** |
| TD AMERITRADE, INC., a New York Corporation, | ) ) ) ) | **PURSUANT TO THE DECLARATORY JUDGMENT ACT 28 U.S.C. § 2201** |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

Plaintiff, Tyler Verdieck ("Plaintiff"), alleges the following based upon the investigation

of Plaintiff's counsel, which includes a review of United States Securities and Exchange

Commission ("SEC") filings by non-party TD Ameritrade Holding Corporation, as well as

regulatory filings and reports, advisories, press releases and media reports concerning TD

Ameritrade Holding Corporation and Defendant, TD Ameritrade, Inc. ("TD Ameritrade" or

"Defendant"). Plaintiff believes that substantial additional evidentiary support will exist for the

allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE CASE

1.      This class action lawsuit seeks to redress broker-dealer Defendant, TD

Ameritrade's disregard for, and violation of, its duty of best execution for Class member "non-

marketable limit orders" ("NMLO").[1] Instead of attempting to ensure that Class members'

---

[1] A limit order generally directs the broker to execute either a *buy* when the price falls to or below a specified level, or to sell when the price rises to or above a specified level. A marketable limit order is an order that is priced for an immediate execution at current market prices. For example, a marketable buy limit has a limit price equal to or greater than the National Best Offer (NBO) and a marketable sell limit has a limit price equal to or less than the National Best Bid (NBB). A non-marketable limit order is a passive order that is not priced for an immediate execution because it is either a buy order with a limit price less than the NBO, or a sell order with limit price greater than the NBB.

NMLOs received the best possible execution, Defendant routed Class members' NMLOs to the single order execution venue, Direct Edge, that paid Defendant the highest payment per order. Defendant's revenue maximization strategy allowed it to unjustly profit at the expense of its retail customers, and had actual, verifiable, negative impact on the overall execution quality of Class member NMLO trades.

2.      The duty of best execution requires that TD Ameritrade examine the overall market to determine which execution venue offers its clients the best price, speed of execution, and likelihood that the trade will be executed, then execute its client's orders accordingly. For many broker-dealers, best execution is determined individually for each order using a pre-trade computer algorithm that monitors market data and signals in real time. However, Defendant has devised an order routing strategy that separates trades into different categories, and sends each category of trade to the venue(s) that pay Defendant the most money for posting Class member orders. Even though Defendant has 11 registered stock exchanges and more than 50 "alternate trading systems" to which Class member NMLOs can be routed, Defendant sends virtually 100% of all NMLOs to a single venue, Direct Edge.[2]

3.      Direct Edge utilizes a "maker/taker" cost structure. On one side of the transaction, Direct Edge pays parties like TD Ameritrade a "rebate" - the highest of any market center - for adding liquidity to Direct Edge's market, such as *inter alia* posting NMLOs. On the other side, market participants that trade against Plaintiff and the Class's NMLOs on Direct Edge must pay a corresponding fee - also the highest in the industry - for taking liquidity from the market. Because market participants must pay an additional fee to trade with Plaintiff and Class members, the Class's shares become the least attractive shares in the entire market. Thus, Class

---

[2] Based on a review of Defendant's quarterly and annual reports filed with the Securities and Exchange Commission during the Class Period, Plaintiff estimates that Defendant has made more than **$500 million in maker rebates** from Class Members' NMLOs sent to Direct Edge during the Class Period.

member NMLOs posted on Direct Edge are the least likely to be filled, and even when they are filled , execute more slowly and at a less competitive price than other market centers Defendant could have chosen to route Class member trades.

4.      In addition to having adverse selection problems causing Class member shares to be chosen last by the market, Direct Edge's market ecosystem gives unfair advantages to high-frequency traders ("HFT") at the expense of Class member trades. Direct Edge's parent company BATS Global Markets is negotiating a settlement with the Securities and Exchange Commission ("SEC") because, *inter alia*, Direct Edge gave HTF access to complicated order functionality unavailable to Plaintiff and the Class that let HFT jump ahead of Plaintiff and the Class to the front of the trading line and hijack price improvements that would otherwise be available for Class member trades. Direct Edge also caters to HFT firms by providing them market data quicker than to other market participants, allowing HFT firms to get a sneak peak at market trends and Class member NMLOs. This allows HFT to predict market movements and capture economic opportunities otherwise available to Plaintiff and the Class. For these reasons, Defendant's decision to route *all* Class member NMLOs to Direct Edge cannot possibly satisfy TD Ameritrade's duty of best execution.

5.      Plaintiff and the Class have paid Defendant flat fee commissions (between $9.99 for internet trades, to $44.99 for broker assisted trades) for order handling and execution of their NMLOs, yet were not provided best execution. Additionally, TD Ameritrade's order routing system caused Defendant to receive approximately $0.30 for every 100 shares that Class members trade on Direct Edge. TD Ameritrade obtained these monies by in derogation of its duty of best execution to the Class. Accordingly, Plaintiff seeks restitution of all flat fee commissions paid to Defendant to execute the Class's NMLOs, a constructive trust on all

payments TD Ameritrade received from Direct Edge for posting executed Class's NMLOs, as well as injunctive and declaratory relief.

## II.   **JURISDICTION AND VENUE**

6.     This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), 1446, and 1453(b). Plaintiff alleges that Plaintiff and Class members are citizens of different states as Defendant, and that the cumulative amount in controversy for Plaintiff and the Class exceeds $5 million, exclusive of interest and costs.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b) because Defendant resides, and has its principal place of business in, this District and many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District, and because the Client Agreement between Plaintiff and members of the Class and Defendant has a venue selection clause selecting this District.

8.     In connection with the acts alleged in this Complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, wire transfers, interstate telephone communications and the facilities of the national securities exchanges.

## III.   **PARTIES**

9.     Plaintiff, Tyler Verdieck ("Plaintiff"), is a retail customer of Defendant, TD Ameritrade. Plaintiff is a citizen of the State of California and a resident of San Diego. During the Class Period, Plaintiff submitted at least one NMLO through Defendant.

10.     Defendant, TD Ameritrade, Inc. ("TD Ameritrade" or "Defendant"), is a New York Corporation with its principal place of business in Omaha, Nebraska. Defendant is a Broker

Dealer registered with the SEC pursuant to Section 15 of the Securities Exchange Act of 1934, 15 U.S.C. § 78o.

11.     TD Ameritrade specializes in "mom and pop" retail investors, and maintains over 6 million client accounts that hold over $600 billion in assets. TD Ameritrade offers its brokerage services primarily online and over the phone, but also in person in over 100 branches nationwide. Under TD Ameritrade's pricing model, customers are charged a flat fee or "commission" per trade. The commission paid by Plaintiff and each Class member is dependent on the method by which an order is placed: $9.99 for orders placed on TD Ameritrade's website, $34.99 for orders received by phone, and $44.99 for orders place with the assistance and/or advice of a TD Ameritrade broker.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     DEFENDANT'S BEST EXECUTION OBLIGATIONS

12.     The duty of best execution predates the federal securities laws, with its roots in the common law agency obligations of undivided loyalty to act exclusively in the principal's best interest and to use reasonable care to transact the agent's business. Defendant's duty of loyalty to Plaintiff and the Class requires TD Ameritrade to place the interests of Class members over Defendant's own interests. Because Plaintiff and the Class seek their own economic gain from retaining TD Ameritrade as their broker, the purpose of the agency is to help Plaintiff and the Class achieve that objective.

13.     TD Ameritrade's duty of loyalty and reasonable care in achieving best execution requires TD Ameritrade to seek the most favorable terms for Class members' NMLO that are reasonably available under the circumstances.

14.     In determining how to route Class member NMLOs, TD Ameritrade is required to take into account material differences in execution quality among the various market centers to

which the orders may be routed, including execution price, market depth, order size and trading character of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, and accuracy of executions. Defendant is not permitted to allow payment from markets such as Direct Edge to interfere with its duty of best execution.

15.     In complying with the duties of best execution, TD Ameritrade must use reasonable diligence to ascertain the *best market* for the subject security Class members are seeking to trade. This involves examining a market's execution price, opportunities for price improvement, and speed, as well as the order size and transaction type, trading characteristics and character of the market for *the security involved* (*e.g.*, price, volatility, relative liquidity, and pressure on available communications), the availability of accurate market information, and the availability of technology to process market information.

16.     Brokers' order handling practices for limit orders must take into account material differences in execution quality (*e.g.*, the likelihood and speed of execution, and the opportunity for price improvement) among the various market centers.

17.     TD Ameritrade is thus required to compare the quality of executions Defendant is obtaining for Class member NMLOs routed to Direct Edge to the executions Defendant could obtain from competing market centers. But Defendant does not choose the "best market" for Plaintiff and Class members' NMLOs because Defendant does not give due consideration to the particular security being traded, or other relevant factors, only that Direct Edge gives Defendant the highest rebate for Class member NMLOs.[3]

18.     The scope of the duty of best execution has evolved over time with changes in technology and transformation of the structure of financial markets. This requires brokers such as

---

[3] Because the various markets are required under SEC Regulation NMS (17 C.F.R. § 242.611) to guarantee the intermarket (or interdealer) best bid or offer available on the market, regardless of where the best quote resides (the "NBBO"), broker dealers must use criteria other than quotes for their order routing choices.

TD Ameritrade to update its processes and procedures for NMLOs to incorporate changes in technology and markets.

19.    Other brokerage firms discharge their duty of best execution by using automated "smart" order routers that continually analyze market signals in real time to predict which execution venue is best able to fill a particular trade. Smart routing systems take into account factors such as quote size, quote price, liquidity-taker costs, liquidity provider rebates and the availability of automatic order execution.[4] However, TD Ameritrade disregards these order routing practices in preference of directing all NMLOs to Direct Edge.

## B.    DEFENDANT ROUTES ALL NMLOs TO DIRECT EDGE TO RECEIVE MAXIMUM "LIQUIDITY REBATES"

20.    For Defendant, TD Ameritrade, fee revenue is the primary determinant of where orders are routed. TD Ameritrade annually generates hundreds of millions of dollars in payment for its order routing practices. This is because TD Ameritrade routes orders in a manner that focuses on payment from market centers at the expense of securing the best order execution for Plaintiff and members of the Class.

21.    As early as 2010, TD Ameritrade's former head of order routing confirmed that by routing their marketable orders to market makers and their nonmarketable limit orders to exchanges, Ameritrade could increase revenue.[5] In furtherance of this goal, Defendant sells the vast majority of its marketable orders to a few select market makers and routes nearly 100% of Class member NMLOs to Direct Edge - the venue offering the most lucrative liquidity rebates. By routing all Class member NMLOs to Direct Edge, TD Ameritrade fails to exercise due care in

---

[4] "The scope of this duty of best execution must evolve as changes occur in the market that gives rise to improved executions for customer orders, including opportunities to trade at more advantageous prices. As these changes occur, broker-dealers' procedures for seeking to obtain best execution for customer orders also must be modified to consider price opportunities that become 'reasonably available.'" Order Execution Obligations, Exchange Act Rel. No. 37,619A (Aug. 29, 1996).

[5] "The Retail King; The Strategy Behind Wall Street's Most Sophisticated Order Sender," *Traders* (Sept. 2010).

executing its clients orders, which deprives Class members of more preferential trading opportunities in the wider marketplace.

22.    Since approximately August 1, 2011, Direct Edge has employed a pricing structure called "maker-taker" for market participants transacting shares on its exchange. Under the maker-taker model, Direct Edge pays a per share "rebate" to orders that provide liquidity to the Direct Edge exchange (*i.e.*, posts tradable shares), and charges a corresponding per share fee for orders that remove liquidity (*i.e.*, accepts a posted quote).

23.    An order that provides or "makes" liquidity is one that is at rest at not-current market prices, awaiting the market to move and another market participant to accept it. An example of this is Class member NMLOs, which are priced outside the prevailing market prices at the time they are submitted to the market for execution. During the Class Period, TD Ameritrade received between \$0.0025 and \$.0032 (25 to 32 "mils") per share for routing Class member NMLOs to Direct Edge.

24.    An order removes liquidity by "taking" or accepting an order resting on an exchange, such as Class member NMLOs. Trading against a NMLO removes liquidity because the shares traded are removed from a market center's pool of shares available to be traded with.

25.    In a letter to SEC Chair Mary Jo White, Senator Carl Levin asserted that "[c]onflicts of interest are inherent in the maker-taker system and payments for order flow." According to Senator Levin, "the system creates a conflict of interest for stockbrokers who have a legal duty to seek best execution of their customer's orders. Maker-taker creates an incentive for brokers to route customer orders to venues that offer brokers the highest rebate [and] away from venues that charge brokers the highest fee, even when those venues may not offer best executions. Academic and market research into order routing decisions suggest that the conflict

is resulting in real harm to investors."[6]

26. Defendant routes nearly 100% of Class member NMLOs to the Direct Edge exchange, which offers TD Ameritrade the highest "maker-taker" rebate available in the marketplace.[7] By routing all of Class member NMLOs to the most profitable exchange, it is all but certain that Defendant is not considering execution price, opportunities for price improvement, market depth, order size and trading character of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, and accuracy of execution as Defendant is required to do. Defendant derogated its duty to use reasonable care in choosing the market center to which Class member NMLOs should be routed. Instead, Defendant lets the revenue received from Direct Edge dedicate its routing decisions.

27. On June 17, 2014, the United States Senate Permanent Subcommittee on Investigations conducted a hearing on, *inter alia*, conflicts of interest in brokerage order routing practices (the "Senate Subcommittee Hearing"). Senator Carl Levin testified that "While [brokers, including TD Ameritrade] make a subjective judgment as to which trading venues provide best execution on tens of millions of trades a year, that subjective judgment just happens to also result in the biggest payment to brokers. I find it hard to believe that this is a coincidence." The truth is that the venues offering the highest rebates, as used by TD Ameritrade, do not in fact offer the best execution for Plaintiff and the Class.

## C. DIRECT EDGE'S "MAKER-TAKER" PRICING MODEL PREVENTS BEST EXECUTION

---

[6] http://www.scribd.com/doc/233999672/Ltr-to-SEC-Chairman-White-Re-Equity-Market-Structure-July-9-2014.

[7] Defendant's disclosures of order routing practices pursuant to SEC Rule 606 (17 C.F.R. § 242.606) do not distinguish between marketable and non-marketable limit orders. Given that Defendant chooses to sell market orders to market makers rather than route them to venues with take fees, Plaintiff alleges on information and belief that nearly all limit orders routed to market makers are marketable, and nearly all limit orders routed to Direct Edge are non-marketable.

28.     The maker-taker fee structure used by Direct Edge negatively influences order execution quality for Plaintiff and the Class. At the Senate Subcommittee Hearing, Senator Levin cited academic research by Professors Robert Battalio and Shane Corwin from the Mendoza College of Business at the University of Notre Dame, and Professor Robert Jennings from the Kelly School of Business at Indiana University (the "*Battalio* Research").[8] The *Battalio* Research confirmed that markets with high take fees cause that market venue to be less attractive for liquidity takers to trade in. As liquidity takers are the putative counterparties to Class member NMLOs, order execution quality for liquidity making quotes such as Class member NMLOs is inversely related to a venue's take fees. This is true across almost all variables relevant to best execution, including order fill rate, time to execution, realized spread, and good fill ratio.[9]

29.     Class members are harmed because Direct Edge's taker fees, the highest in the industry, cause Class NMLOs to be the least attractive quotes on the market, generally chosen last from all available quotes. In situations where all things are equal at two execution venues, with both offering the best price available on any market, liquidity takers (those accepting a posted bid or offer) first route orders to the venue with the lower take fee. The *Battalio* Research confirmed that "[a]ll else equal, we find that fill rates for displayed limit orders are lower on exchanges with higher fees. In addition, for filled limit orders, executions take longer on high-fee venues than on low-fee venues. These results confirm the negative relation between take fees and limit order execution quality."

---

[8] *Battalio, et al.*, Can Brokers Have It All? On the Relation Between Make-Take Fees And Limit Order Execution Quality,
http://www1.villanova.edu/content/dam/villanova/VSB/assets/marc/marc2014/BattalioCorwinJennings_20140228.pdf

[9] For executed non-marketable limit buy orders, the Realized Spread is also equal to twice the difference between the midpoint of the bid ask spread prevailing five minutes after order receipt and the limit price. For sell orders, the Realized Spread is equal to twice the difference between the limit price and the bid/ask midpoint five minutes after order receipt. The Good Fill Ratio is the percentage of executed limit orders with positive realized spreads in excess of the limit order price.

30.     For example, if Direct Edge and another trading center are both displaying quotations to sell a stock for $10.00 per share, Class members' shares are available for purchase at a total price of $10.00 plus the $0.0029 "taker" fee, while the second trading center might not charge any fee, or charge a lower fee. What might appear to be identical quotations are in fact far from identical once the attendant taker fee is added on.

31.     Although the *Battalio* Research confirmed empirically the negative impact of Direct Edge's high take fees, this information has been available in the market throughout the Class Period. Since at least 2004, market participants quoted in SEC regulations have recognized the problem with market venues such as Direct Edge charging "outlier" fees. According to Instanet, an agency brokerage that was one of the pioneers of electronic trading, "market participants have put them at *the bottom of their order routing tables,* which means that orders placed on these [markets] would be the last to be executed at any price level, a position that *no market participant wants to be in*." 70 F.R. 37496-01 * 37544 (emphasis added). By failing to exercise due care to address the negative impact on execution quality resulting from Direct Edge's outlier taker fees, TD Ameritrade fails to provide best execution, and continues to subject Class member NMLOs to the market most detrimental to Class member interests.

32.     The *Battalio* Research confirmed that orders on venues with high take fees fill less often than similar orders on venues with low take fees. Professor Battalio testified to the Senate Subcommittee Hearing that routing strategies designed to maximize rebate income can result in customer orders being routed to an exchange where they are as much as 25 percent less likely to be executed. Because other NMLOs with smaller or no "take fees" are chosen first by traders' order matching engines, there are fewer interested counterparties available to trade with Plaintiff and Class member NMLOs, causing the fill rate for Class member trades to go down.

33.     The *Battalio* Research also found that orders filled at high fee venues like Direct Edge fill more slowly. Conversely, low fee venues not only fill a higher percentage of their orders than Direct Edge, they also execute orders more quickly. In other words, Defendant does not seek out the best exchange that will offer Plaintiff and the Class the quickest and best chance of having their NMLOs being filled.

34.     The *Battalio* Research also confirmed that limit orders posted on high fee venues such as Direct Edge resulted in negative improvement on the available spread between best available bid and offer, meaning that Class member NMLOs lose out on opportunities to receive better prices for their trades, and are generally executed in circumstances where prices move against the Class's trade after execution. Venues with the lowest fees for liquidity takers have exactly the opposite effect on the quality of execution, providing NMLOs with price improvement and execution during circumstances where market prices move in the trader's favor after the order executes. Thus, Class member NMLOs are generally filled when they are likely on the wrong side of where the market is going -- traded in front of by HFT (as discussed below) when they are on the right side of the market, and filled when they are "wrong."

35.     A similar conclusion was reached through research conducted in 2010 by Professors James Angel from the McDonough School of Business at Georgetown University, Lawrence Harris, from the Marshall School of Business at the University of Southern California, and Chester Spatt from the Tepper School of Business at Carnegie School of Business (the *Angel* Research").[10] The *Angel* Research revealed that across-exchange differences in fee schedules create situations in which equally priced NMLOs resting on separate exchanges have different 'net price' priority. All else being equal, when two venues offer the best price, liquidity demanders arriving in the marketplace will first route their orders to the venue with the lower

---

[10] *Angel, et al.*, Equity Trading in the 21st Century, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1584026.

take fee. The *Angel* Research found that limit orders on the venue with the higher taker fee (and thus, the higher make rebate) like Direct Edge can become isolated and miss profitable trading opportunities, and are statistically and probabalistically more likely to trade when the price moves against them and less likely to trade when prices move in their favor.

36. The *Battalio* Research concluded that "overall, the results of the order data analysis are consistent with a <u>strong negative relation between take fees and retail limit order execution quality</u>. These findings suggest that the decision to route all limit orders to a single venue paying the maximum rebate (and, correspondingly charging the maximum take fee) <u>is inconsistent with a broker's responsibility to obtain best execution</u>" (emphasis added). Thus, TD Ameritrade's practice of routing all Class member NMLOs orders to Direct Edge (the venue with the highest maker rebate and correspondingly high take fee) is axiomatically inconsistent with its duty of best execution of Class members' NMLOs.

37. Tom Farley, President of the New York Stock Exchange (NYSE), testified at the Senate Subcommittee Hearing that there are inherent conflicts of interest when brokers such as Defendant, TD Ameritrade, make order routing decisions based on payment from execution venues. Joseph Brennan, the Vanguard Group's Head of Global Equity Index Group, testified that "the maker-taker pricing model creates an appearance of a conflict of interest," and that "the decision to submit orders to public markets should not be driven by the desire to capture a rebate or avoid a fee." Mr. Brennan testified at the Senate Subcommittee Hearing that accepting payments for order flow would create a conflict of interest, so Vanguard does not do so.

38. Steven Quirk, Senior Vice President at TD Ameritrade (which was specifically referenced in the *Battalio* Research), testified that the size of a rebate offered by execution venues influences TD Ameritrade's decision about where to route orders. Mr. Quick did not

dispute that TD Ameritrade virtually always routes customer orders to venues paying the highest rebates.

### D. DIRECT EDGE CATERS TO HIGH FREQUENCY TRADERS TO THE DETRIMENT OF PLAINTIFF AND THE CLASS

39. Defendant, TD Ameritrade's decision to route all Class member NMLOs to Direct Edge results in Class member orders interacting with toxic HFT strategies designed to take advantage of unsophisticated retail order flow. Direct Edge created special order types that allow HFT firms to jump in front of Class member NMLOs, and sells HFT firms market data that allows HFT firms to front run Class member trades.

40. To maximize the benefits of high speed trading, at the request of HFT, Direct Edge has designed hundreds of preferential "order types" – preprogrammed commands traders use to tell exchanges how to handle their bids and their offers to sell. In their simplest form, order types give an exchange's customer different ways to interact with the market. But Direct Edge developed these new and exceedingly complex order types to benefit HFT firms at the expense of retail trades such as Plaintiff and the Class's NMLOs.

41. Direct Edge's special order types allow HFT firms to cut to the front of the trading line and receive priority queue position ahead of Plaintiff and the Class's trades in violation of price-time priority.[11] The special order types Direct Edge makes available to HFT firms make it more difficult for the traditional NMLOs utilized by Plaintiff and the Class to get filled in the expected way. Direct Edge's "queue jumping" features cause Plaintiff and Class member NMLOs to fall to the back of the queue and tend to miss execution at the expected time and/or price.

---

[11] Price-time priority is a fundamental principle of U.S. equity markets, which provides that the first investor to place an order at the best current price generally should be the one whose order is filled first.

42.    The ability to gain access to the top of Direct Edge's "order book," or the queue

of buy and sell orders that are typically ranked by price and time they were received, is crucial

for HFT firms to execute their predatory strategies. The complex order types created and

provided by Direct Edge give HFT firms superior queue positioning, including the ability to

jump ahead of other investors in Direct Edge's order book. This enables HFT firms to regularly

and repeatedly profit at the expense of Plaintiff and Class member NMLOs. The complex order

types created by Direct Edge that preference HFT firms over Plaintiff and the Class include, *inter*

*alia*:

- order handling practices that permit HFT firms to step ahead of Class member orders in violation of established rules of price/time priority and precedence;
- rebooking and repositioning of investor orders that permit HFT firms to escape disadvantageous trades; and
- insertion of HFT intermediaries in between legitimate customer-to-customer matching;[12]

43.    One high frequency trader discussed these order types that allow queue jumping:

"We talk a lot to the exchanges, to optimize the order type for a given trade. … *what's really*

*essential is to jump to the head of the queue. You pay for it, but you jump to the head.*"[13]

44.    Direct Edge worked with HFT firms to create ways for those firms to make

guaranteed profits at the expense of retail investors such as Plaintiff and the Class.

45.    As Direct Edge realized it could generate vast profits from attracting HFT firm

orders and fees, it began aligning its interests with those of the HFT firms, including enabling

predatory HFT strategies by creating new order types to get them to the top of the queue. One

HFT insider and staunch defender of HFT practices estimated that inferior queue positioning can

---

[12] Haim Bodek, *The Problem Of HFT: Collected Writings On High Frequency Trading & Stock Market Structure Reform* 11-12 (2013) ("*The Problem of HFT*").

[13] Laurie Carver, *Exchange Order Types Prompt Fears of HFT Conspiracy* (Apr. 23, 2013), available at http://www.risk.net/risk-magazine/feature/2261626/exchange-order-types-prompt-fearsof-hft-conspiracy.

cost investors 1.7 cents per share, resulting "in *tens of millions of dollars (conservatively) of extra trading costs for investors (and profits for HFTs)*."[14]

46.     One of the most abusive order types developed by Direct Edge for the benefit of favored HFT firms is the "Hide Not Slide" that allows high frequency traders to post orders that remain hidden at a specific price point at the front of Direct Edge's trading book when the market is moving, while at the same time pushing other traders to the back of the order book queue. As a result, Plaintiff and Class members' NMLOs lose their priority in the queue when the market shifts.

47.     The Hide Not Slide order is a key weapon in the HFT arsenal that allows HFT firms to generate "guaranteed profits" at the expense of less sophisticated market participants such as Plaintiff and the Class.

48.     At a December 2009 holiday party, the Director of Sales for Direct Edge told one investor whose firm had been bleeding profits for several months using standard limit orders that he is "totally screwed" unless he takes advantage of complex order types available at Direct Edge such as Hide Not Slide.[15] The Direct Edge representative, Eugene Davidovich, even admitted that the Hide Not Slide order "probably should be illegal, but if we changed things, the high frequency traders wouldn't send us their orders."[16]

---

[14] Attached chart to April 21, 2010 letter from Manoj Narang, Tradeworx, Inc. CEO, to Elizabeth Murphy, SEC Secretary, at 17, *available at* http://www.sec.gov/comments/s7-02-10/s70210-129.pdf (noting the profitability difference between being first in line versus last in line).

[15] Scott Patterson, *Dark Pools: The Rise of the Machine Traders and the Rigging of the U.S. Stock Market* (2012) ("*Dark Pools*")at 50-51; Scott Patterson & Jenny Strasburg, *For Superfast Stock Traders, a Way to Jump Ahead in Line* (Sept. 19, 2012) , *available at* http://online.wsj.com/news/articles/SB10000872396398920457755992436935 61670.

[16] *Dark Pools* at 51; Patterson & Strasburg, *supra*.

49.     In addition, Direct Edge sells co-location and direct and enhanced market information services to HFT firms. In doing so, Direct Edge provides HFT firms with an enhanced glimpse into what the market is doing before others who do not have similar access. As a result, Direct Edge utilized a two-tiered market where Plaintiff and Class members trade with an informational disadvantage to technology-enhanced HFT firms.

50.     SEC Regulation National Market System ("Reg NMS" 17 C.F.R. § 242.603) requires that execution venues transmit market data so as to be received by all market participants at the same time. However, Direct Edge sold and continues to sell alternative data feeds to market participants, for extremely high fees, that provide either or both of (a) faster transmission of data regarding bids and offers than received by the rest of the market (*i.e.*, so-called "direct feeds") and (b) a greater depth of data regarding bids and offers than made available to the rest of the market (*i.e.*, so-called "enhanced feeds"). For an extremely high fee, these alternative data feeds give HFT firms an enormous competitive advantage when interacting with Plaintiff and the Class.

51.     HFT firms receive these direct market data feeds from Direct Edge at speeds faster than the rest of the market. Moreover, the sensitive direct feed trading data allows HFT firms "to track when an investor changes price on his order, how much stock the investor is buying or selling in accumulation, as well as the ascertaining of hidden order flow."[17] Consequently, "[t]his information assists HFTs in predicting short-term price movements with near certainty."[18]

---

[17] Sal Arnuk & Joseph Saluzzi, *Exchanges and Data Feeds: Data Theft on Wall Street* at 1 (May 11, 2010), *available at* http://www.themistrading.com/article_files/0000/0554/THEMIS

TRADING-_White_Paper_--_Data_Theft_On_Wall_Street_--_05-11-10.pdf.
[18] *Id.*

52.     In 2012, Robert Khuzami, Director of the SEC's Division of Enforcement, stated that:"*[I]mproper early access to market data, even measured in milliseconds, can in today's markets be a real and substantial advantage that disproportionately disadvantages retail and long-term investors*."[19]

53.     Direct Edge provides further advantages to HFT *via* "enhanced feeds." Enhanced feeds provide greater depth of information than the standard data transmitted to the market. The standard data feed provides "the top of the book": the single best bid and the single best offer for a given stock on *any* of the exchanges. At ascending price levels, Direct Edge's enhanced feeds provide greater depths of order book information, starting from a feed providing the single best bid and the single best order on *that* exchange (rather than, as with standard data feed, the single best bid and the single best offer from *any* of the exchanges) to a feed providing each and every bid and each and every order on Direct Edge. This greater depth of market information is important, because the greater depth of market information an investor has, the more informed a decision the investor can make concerning market trends: the state of the market for a given stock or industry, the direction of market movement of that stock or industry, the total market demand for a stock or industry, etc. This greater depth of data is especially useful to HFTs, who feed it into computers with algorithms that analyze and respond to it immediately, enabling them to engage in the manipulative conduct described herein.

54.     Even assuming all market participants had access to all of Direct Edge's services, Direct Edge's CEO himself admitted that "[t]he process for acquiring and using this [market] data is currently cumbersome and expensive," and "entails significant fixed costs even before

---

[19] Press Release, *SEC Charges New York Stock Exchange for Improper Distribution of Market Data* (Sept. 14, 2012), *available at* http://www.sec.gov/News/PressRelease/Detail/PressRelease/1365171484740#.VATf_6Pn93w.

any explicit exchange market data fees are paid, with total costs for retail firms of upwards of $1 million or more per month. This leads to such information being restricted, creating the perception of 'haves' and 'have nots.'"[20]

55.     As a result of its conduct, Direct Edge has come under the microscope of regulators. In March 2012, it was reported that the SEC was "examining the communications between some rapid-fire trading firms and Direct Edge Holdings LLC."[21] In early August 2014, it was reported that Direct Edge's parent company was in advanced talks with the SEC to settle allegations that it, and Direct Edge, gave unfair advantages to high-speed traders, including creating and providing order types that gave HFT firms an edge over investors in Direct Edge markets. Former Direct Edge CEO O'Brien was reportedly ousted in large part because of the SEC investigation, forthcoming settlement and related public misstatements surrounding the data feeds Direct Edge utilizes to price stock trades on its exchanges.

56.     Accordingly, based on information known within the industry, Defendant should have known that routing all of its client's NMLOs to Direct Edge would result in the least preferential trading position for Plaintiff and other Class members. Yet Defendant failed to exercise reasonable care in discharging its duty to investigate whether Direct Edge's maker-taker

---

[20] Press Release, *Direct Edge Statement of Market Structure Principles*, Prepared remarks of Direct Edge CEO William O'Brien to be delivered June 20, 2012 before The Committee on Financial Services Subcommittee on Capital Markets and Government Sponsored Enterprises, United States House of Representatives at a hearing titled "Market Structure: Ensuring Orderly, Efficient, Innovative and Competitive Markets for Issuers and Investors" (June 19, 2012), *available at*

http://www.directedge.com/About/PressReleases/tabid/363/articleType/ArticleView/articleId/79/Drect-Edge-Statement-of-Market-Structure-Principles.aspx.

[21] Scott Patterson & Jean Eaglesham, *SEC Probes Rapid Trading* (Mar. 23, 2012), *available at* http://online.wsj.com/news/articles/SB10001424052702304636404577297840134760650.

fees and market structure was disadvantageous to the Class when compared to other execution venues, and choose to instead focus on Defendant's own bottom-line.

## V.  CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of a class consisting of: "*all retail clients of TD Ameritrade, Inc. who, from August 1, 2011 to the present, placed non-marketable limit orders through TD Ameritrade that were executed on the Direct Edge exchange*" (the "Class"). Excluded from the Class are Defendant, the officers and directors of Defendant, successors and assigns, and any entity in which Defendant has or had a controlling interest, as well as other broker dealers.

58.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendant or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of TD Ameritrade's fiduciary duty of best execution complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     The scope of Defendant's duty of best execution to Plaintiff and the Class;

(b)     Whether there is heterogeneity in Defendant's order routing practices for Class member NMLOs;

(c)     Whether Defendant routes Class member NMLOs to Direct Edge primarily to obtain maker rebate income;

(d)     Whether Direct Edge's high maker-taker fee / rebate structure negatively impacts best execution of Class member NMLOs;

(e)     Whether Direct Edge's market ecosystem favors HFT to the detriment of Plaintiff and the Class;

(f)     Whether TD Ameritrade's routing of all Class member NMLOs to Direct Edge to capture rebate income violates Defendant's duty of best execution;

(g)     Whether Class members have been damaged by Defendant's violation of the duty of best execution, and if appropriate, the proper measure of damages;

(h)     Whether Defendant has been unjustly enriched by violating its duty of best execution to Plaintiff and the Class, and the amount of Defendant's unjust enrichment;

(i)     Whether Plaintiff and the Class are entitled to restitution of their flat-fee commissions paid to TD Ameritrade for executing Class member NMLOs;

(j)     Whether TD Ameritrade must disgorge to Plaintiff and the Class the revenues it obtained from Direct Edge in violation of Defendant's duty of best execution;

(k)     Whether Plaintiff and the Class are entitled to declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that *inter alia* TD Ameritrade's decision to route all Class member NMLOs to Direct Edge violates Defendant's duty of best execution;

(l)     Whether Plaintiff and the Class should be awarded attorneys' fees and the costs of suit.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. While the aggregate damage to the Class, and Defendant's wrongful revenues, are significant, the damage suffered by individual Class members may be relatively small. The expense and burden of individual litigation thus make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

63.     Defendant has acted on grounds generally applicable to the entire Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT ONE

### BREACH OF FIDUCIARY DUTIES AND THE DUTY OF BEST EXECUTION

64.     Plaintiff incorporates by reference and realleges each and every paragraph alleged above as though fully alleged herein.

65.     TD Ameritrade's Client Agreement for Plaintiff and each Class member has a "Governing Law" provision that designates Nebraska law (but not Nebraska's conflict of laws provisions) as the state law governing the parties' relations.

66.     Plaintiff and members of the Class are principals, and Defendant, TD Ameritrade, is the agent of Plaintiff and the Class in executing their trades, including the routing of Class member NMLOs.

67.     The purpose of the agency is to execute Plaintiff and Class member trades, getting the optimal combination of price, speed, and liquidity, and the most favorable terms reasonably available under the circumstances.

68.     As agent of Plaintiff and the Class, TD Ameritrade is required to act solely for the benefit of Plaintiff and the Class in all matters connected with executing trades, even at the expense of TD Ameritrade's own interests. TD Ameritrade has an obligation to abstain from engaging in any conduct harmful to Plaintiff and the Class's interests.

69.     As agent, TD Ameritrade is not permitted to use its position as broker to further its financial interests at the expense of Plaintiff and the Class, and is prohibited from profiting from the agency relationship to the detriment of the Plaintiff and the Class or having a personal stake that conflicts with the interests of Plaintiff and the Class interest in transactions concerning Class member trades.

70.     TD Ameritrade has no authorization from Plaintiff and the Class to sacrifice their entitlement to best execution to Defendant's quest for maker rebate income.

71.     Defendant breached its fiduciary duty of best execution to Plaintiff and the Class by routing all NMLOs to Direct Edge for the purpose of obtaining maker rebates at the expense of Class member trades.

72.     Defendant's routing of all Class member NMLOs to Direct Edge created a conflict of interest between Plaintiff and the Class on the one hand, and TD Ameritrade on the other hand.

73.     Defendant's routing of all Class member NMLOs to Direct Edge caused Plaintiff and the Class to not receive best execution for their trades.

74.     As a direct and proximate result of Defendant's breach of its duty of best execution, Plaintiff and Class members were damaged in the amount of fixed commissions they

paid TD Ameritrade for this purpose. In addition, Plaintiff and the Class were damaged by the amount of lost economic benefit available for their NMLOs, in an amount to be proved at trial.

75.     Defendant's routing of all Class member NMLOs to Direct Edge benefitted TD Ameritrade at the expense of Plaintiff and the Class. TD Ameritrade does not pass maker rebates onto Plaintiff and other members of the Class.

76.     Plaintiff is informed and believes that Defendant, TD Ameritrade, received and retained approximately $500 million in maker rebates from Direct Edge as a direct and proximate result of violating its duty of best execution to Plaintiff and the Class. Plaintiff and the Class are entitled to a constructive trust over these funds (as well as interest, income and profits derived therefrom) because Defendant obtained title to the maker rebates from TD Ameritrade by means of an abuse of its agency relationship with Plaintiff and the Class. Under the circumstances, TD Ameritrade should not, according to the rules of equity and good conscience, be permitted to retain these funds, as to do so would unjustly enrich Defendant at the expense of the Class.

## COUNT TWO

### DECLARATORY RELIEF PURSUANT TO
### THE DECLARATORY JUDGMENT ACT

77.     Plaintiff incorporates by reference and realleges each and every paragraph alleged above as though fully alleged herein.

78.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the Class are entitled to have this Court establish by declaration their rights concerning Defendant's routing of Class member NMLOs.

79.     Accordingly, Plaintiff, on behalf of the Class, prays for a declaration that TD Ameritrade's decision to route all Class member NMLOs to Direct Edge violates Defendant's duty of best execution.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for relief and judgment as follows:

A.      For an order declaring that this action is properly maintained as a class action and certifying a class representative in accordance with Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representative for the Class, and appointing Plaintiff's counsel as Class counsel;

B.      For an order awarding Plaintiff and the members of the Class damages, restitution, and/or disgorgement, an injunction prohibiting Defendant from basing order routing decisions on payment for order flow, and/or other equitable relief as the Court deems proper, including, but not limited to, imposition of a constructive trust upon Defendant's revenues resulting from violations of law and duty described herein;

C.      For an order enjoining Defendant from continuing to violate its duty of best execution as alleged herein;

D.      For declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201;

E.      For an order awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest;

F.      For an order awarding attorneys' fees and costs of suit, including experts' witness fees as permitted by law; and

G.      Such other and further relief as this Court may deem just and proper.

## VII.  JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated:  September 23, 2014.

Respectfully submitted,

TYLER VERDIECK, A California Citizen,
Individually And On Behalf Of All Others Similarly
Situated, Plaintiff,

By: _____

David S. Houghton, #15204
Daniel J. Epstein, #21939
HOUGHTON, WHITTED & WEAVER, PC, LLO
6457 Frances Street, Suite 100
Omaha, Nebraska  68106
Telephone:  (402) 344-4000
Facsimile:  (402) 930-1009
E-mail:   dhoughton@houghton-law.com
        depstein@houghton-law.com

*Liaison Counsel*

and

William R. Restis, Esq. (SBN 246823)
Jeffrey R. Krinsk, Esq. (SBN 109234)
Mark L. Knutson, Esq. (SBN 131770)
Trenton R. Kashima, Esq. (SBN 291405)
FINKELSTEIN & KRINSK LLP
501 West Broadway, Suite 1250
San Diego, California 92101-3579
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425
E-mail:   wrr@classactionlaw.com
         jrk@classactionlaw.com
         mlk@classactionlaw.com
         trk@classactionlaw.com

*Lead Counsel*

*Attorneys for Plaintiff and the Putative Class*

390208

26