# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRUCE LERNER, on Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No. |
| Plaintiff, | ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) | |
| TD AMERITRADE, INC., | ) ) | |
| Defendant. | ) ) ) | |
| | ) | **DEMAND FOR JURY TRIAL** |

Plaintiff Bruce Lerner ("Plaintiff") brings this action on behalf of himself and all others similarly situated (the "Class") against defendant TD Ameritrade, Inc. ("TD Ameritrade" or "Defendant"), and states:

**NATURE OF THE ACTION**

1. This class action lawsuit seeks redress for TD Ameritrade's breach of its duty of "best execution" when routing a specific type of investment trade for execution on behalf of its customers, known as a "non-directed, standing limit order."[1] TD Ameritrade is a brokerage firm

---

[1] Unless the client specifically instructs otherwise (thereby making it a "directed order" versus the normal "non-directed order"), the broker chooses the particular trading venue. A "limit order" is an order to buy or sell a stock at a specified price (the "limit") or better. There are two basic categories of limit orders: marketable and non-marketable (or "standing") limit orders. A limit order is marketable if it generates a trade when the order arrives at a trading venue. Otherwise, the limit order is a "standing" order and is placed onto the trading venue's limit order book where it will remain until it cancels, expires, or trades.

that executes orders for stock and other investment trades on behalf of its clients. As part of providing trade execution services, it routes trades to trading venues that effectuate the purchase or sale of the equity. TD Ameritrade selects the trading venues that it wants to execute its customer's trades. All of the trading venues TD Ameritrade selects pay TD Ameritrade kickbacks for sending them trades to execute. As detailed below, TD Ameritrade's automated, non-discretionary routing policy and practice is to direct customer orders to the trading venues that pay TD Ameritrade the largest kickbacks rather than the trading venues that will fulfill TD Ameritrade's duty of best execution. This policy and practice violates TD Ameritrade's duty of best execution, constituting a breach of TD Ameritrade's fiduciary duty to the Class. This action seeks to end this practice by foreclosing TD Ameritrade's consideration of kickbacks in deciding where to send trades and to disgorge the money TD Ameritrade wrongfully obtained as a result of its breach.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the Class of plaintiffs are citizens of states different from TD Ameritrade. Further, greater than two-thirds of the Class members reside in states other than the states in which Defendant is a citizen.

3. Venue is proper in this Court because many of the acts and transactions giving rise to this action occurred in this District and Defendant's principal executive office is in this District.

4. This Court has personal jurisdiction over Defendant because it is a corporation with headquarters in Nebraska.

## PARTIES

5.    Plaintiff Bruce Lerner is a citizen of California. Plaintiff has been a client of TD Ameritrade since before 2006. Plaintiff placed non-directed, standing limit orders with TD Ameritrade in the past, and plans to do so in the future. Plaintiff has been and will continue to be subject to TD Ameritrade's improper practices arising out of the non-directed, standing limit orders he makes. As a result of TD Ameritrade's improper practices described herein, TD Ameritrade has breached its fiduciary duties, including the duty of best execution in connection with Plaintiff's non-directed, standing limit orders.

6.    Defendant TD Ameritrade is an introducing securities broker-dealer and a registered investment advisor. TD Ameritrade is an indirect wholly-owned subsidiary of TD Ameritrade Holding Corporation. In 2013, TD Ameritrade executed over ninety-two million trades. At the end of 2013, TD Ameritrade had over 5.9 million funded client accounts with collective assets of over $555 billion. TD Ameritrade is a New York corporation and is headquartered in Nebraska.

## BACKGROUND REGARDING THE MAKER-TAKER MODEL

7.    Brokers, such as TD Ameritrade, have a significant number of venues from which to choose when deciding where to route their client orders for execution. Regardless of the exchange on which a stock is listed, stocks can be traded at a number of different trading venues, such as one of the major exchanges (e.g., New York Stock Exchange ("NYSE"), the NASDAQ Stock Market or Direct Edge ECN, LLC ("Direct Edge")), hedge funds (e.g., Citadel LLC ("Citadel")), banks (e.g., Citigroup Inc. and UBS AG), electronic communications networks, and third-party market makers that hold shares of securities in their own inventory to create a market for both buyers and sellers of those securities. There are approximately thirteen public exchanges, plus over forty additional trading venues.

{00077799.V1}

8.      Kickbacks arise under a system referred to as the "maker-taker" model.  Under the "maker-taker" arrangement, trading venues pay brokers a "rebate" when brokers send or "make" a standing limit buy or sell order to the trading venue, and charge an access or "taker" fee to the brokers that "take" the order.  These "make" order "rebates" are kickbacks.  Different trading venues pay kickbacks in differing amounts or none at all.  By maximizing maker kickbacks and minimizing taker fees by sending orders to a particular trading venue, brokers can add tens of millions of dollars to their bottom lines.

9.      Unlike some brokers, TD Ameritrade does not pass on these lucrative kickbacks that it receives for routing the orders of Plaintiff and Class members to particular trading venues.

10.     Market experts, including Chris Nagy, TD Ameritrade's own former managing director of order routing strategy, acknowledge that the maker-taker system sets up financial incentives that can cause brokers to act to the detriment of their retail investor clients.  In 2009, Mr. Nagy conceded in an article published in Forbes on September 10, 2009, that under the maker-taker system "there is a higher cost to retail investors and typically there's no better pricing."

11.     In November 2013, RBC Capital Markets Corporation ("RB Capital Markets") wrote the SEC to explain that "maker/taker pricing has compromised efficiency and liquidity, predominantly by incentivizing some market participants to trade primarily, if not solely, to profit from collecting rebates."  RBC Capital Markets also stated: "maker/taker implicates a conflict of interest between brokers and clients.  The conflict manifests by incentivizing brokers to use routing that may be most cost-effective for them, but which may not be the best method of execution for their clients."

12.     Similarly, BlackRock, Inc., the world's largest money manager, wrote in an April 2014 white paper that "[a]chieving best execution for clients should be the sole objective in order

handling practices," but the maker-taker rebate/fee models "significantly influence the order handling and routing practices of broker-dealers … [which], in turn creates a potential conflict of interest for brokers."

13. Jeffrey Sprecher, Chief Executive Officer of Intercontinental Exchange Inc., which now owns the NYSE, has argued for the elimination of the maker-taker payment method: "I don't like the idea that you pay people to trade—I don't think that it should be done…. I don't think it should be legal. It puts wrong incentives in the market."

## TD AMERITRADE'S DUTY OF BEST EXECUTION

14. TD Ameritrade has a duty of fair dealing, a duty to use reasonable diligence to ascertain the best market, and a duty of best execution in buying and selling stocks, bonds, options, and other assets on behalf of its clients.

15. The duty of best execution predates federal securities laws, and is rooted in common law agency principles of undivided loyalty and reasonable care. In all instances, best execution requires the broker to put the interests of its customers ahead of its own and to use reasonable diligence so that the resultant price to the customer is as favorable as possible. Delivering best execution is fundamental to maintaining the integrity of the market.

16. When delivering best execution for non-directed, standing limit orders, brokers, including TD Ameritrade, must take into account any material differences in execution quality (i.e., the likelihood of execution, speed of execution, and price improvement opportunity) among different venues.

17. TD Ameritrade describes best execution as follows:

Best execution is a broker/dealer's obligation to seek the best terms reasonably available when executing a transaction on behalf of a client. While there is no one standard of what determines best execution, speed of transaction, execution price, price improvement opportunities and liquidity are typically listed by our clients as

the factors that are most important to them. Simply put, most of our clients want their orders filled in their entirety, as fast as reasonably possible, and at the price they were quoted or better.

18.     Delivering best execution is fundamental to market integrity and to the delivery of good outcomes for investors who rely on agents to act in their best interests.  Pursuant to best execution, brokers are required to use reasonable diligence to ascertain the best trading venue so that the resultant price to the customer is as favorable as possible.  Brokers, such as TD Ameritrade, are not permitted to allow kickbacks, such as rebate payment inducements, to interfere with their duty of best execution.

19.     TD Ameritrade acknowledges that it owes its clients a duty of best execution.  For example, on the "Frequently Asked Questions" portion of its website relating to "Order Execution," TD Ameritrade states:

> Brokers are obligated to seek the best execution that is reasonably available under current market conditions for their clients' orders.  They must regularly and rigorously evaluate the orders they receive to determine which markets, market makers, or Electronic Communication Networks (ECNs) offer the most favorable terms of execution.  Order-routing practices should then be modified based on this information.

20.     TD Ameritrade's duty of best execution does not require individualized, trade by trade determinations where to send each trade for execution.  Instead, TD Ameritrade may properly make best execution determinations for types of trades that permit trade execution determinations in the aggregate.  Nonetheless, TD Ameritrade's aggregate determination must adhere to its duty of best execution and it is not permitted to put its interests ahead of its clients.  Although TD Ameritrade makes trade execution determinations in the aggregate, it puts its interests ahead of its clients.

## TD AMERITRADE'S CONDUCT

21.     In breach of its duty of best execution, TD Ameritrade maintains a trade execution policy and practice where it steers trades to the trading venue that will pay it the largest kickback, rather than the trading venue that will best execute the trades.  As further detailed below, according to testimony during a U.S. Senate hearing from Steven Quirk, a senior executive at TD Ameritrade, TD Ameritrade routes nearly all of its clients' orders through whichever venues pay TD Ameritrade the highest rebate, regardless of best execution principles.  In fact, during his Senate testimony, Mr. Quirk stated that in the fourth quarter of 2012, TD Ameritrade routed 100% of its standing limit orders to the trading venue that paid the highest kickback.

22.     TD Ameritrade acts in derogation of the fiduciary duties owed to its customers by failing to provide best execution for their orders.  In exchange for hundreds of millions of dollars in kickbacks, and in violation of applicable law, TD Ameritrade directs large blocks of its clients' trade orders to the pre-determined trading venues where TD Ameritrade will maximize kickback revenue.

23.     For more than ten years, TD Ameritrade has utilized an automated system known as the Ameritrade Order Management (AOM) system to direct standing limit order flow to pre-determined trading venues.  In accordance with the AOM system, individual customer orders are routed based on an aggregate order-handling policy and practice that has been pre-set for large blocks of trades.  TD Ameritrade's AOM has the ability to separate market and limit order flow, as well as marketable and standing orders.

24.     TD Ameritrade admits that it routes client orders to trading venues based on maximizing rebate kickbacks.  During his testimony before the U.S. Senate, TD Ameritrade's Mr. Quirk conceded that kickback  payment consideration impacted all of TD Ameritrade's order

routing decisions.  As such, all of the non-directed, standing limit orders placed by Plaintiff and Class members were subject to TD Ameritrade's market selection and order routing policy and practice that always focused on maximizing rebate kickbacks for TD Ameritrade:

> [Senator Carl Levin:] So, again, your subjective judgment as to which market provided best execution for tens of millions of customer orders virtually always led you to route orders to the markets that paid you the most?
>
> [Steven Quirk:] No, it wouldn't have always led us…
>
> [Senator Carl Levin:] I said "virtually always."
>
> [Steven Quirk:] Virtually, yeah.

25.     Reports TD Ameritrade filed with the SEC, backed up by Mr. Quirk's Senate testimony, further confirm that TD Ameritrade routes almost all of its clients' orders to only a few trading venues that each pay TD Ameritrade large kickbacks.  For example, in the first quarter of 2014, TD Ameritrade routed 93% of standing limit orders for NYSE-listed securities to trading venues Direct Edge, Citadel Execution Services, and Citi Global Markets, each of which paid TD Ameritrade rebate kickbacks:



**TD Ameritrade**                                    **SEC Rule 606 Report**

**TD Ameritrade, Inc. Member FINRA/SIPC/NFA – First Quarter 2014**
(Percentages of Total Non-directed Orders Routed to Individual Market Centers)

| Securities Listed on the NYSE Euronext | | | | |
|---|---|---|---|---|
| **Routing Venue** | **Order Percentage Statistics** | | | |
| | **Total Orders (%)** | **Market Orders (%)** | **Limit Orders (%)** | **Other Orders (%)** |
| Direct Edge | 40% | 0% | 47% | 1% |
| Citadel Execution Services | 35% | 55% | 30% | 86% |
| Citi Global Markets | 17% | 26% | 16% | 8% |

26.     Direct Edge, to which TD Ameritrade routed nearly half of its clients' limit orders in the first quarter of 2014, paid $0.0035 per share in kickbacks—the highest kickback amongst venues.  In sharp contrast, TD Ameritrade did not route a single market order to Direct Edge, which

does not pay maker kickbacks for executing market orders. Instead, TD Ameritrade routed its market orders to the two trading venues which paid TD Ameritrade kickbacks for those types of orders—Citadel Execution Services and Citi Global Markets.

27. In the fourth quarter of 2013, Direct Edge, Citadel Execution Services, and Citi Global Markets received 96% of TD Ameritrade's total limit orders for NYSE-listed securities. Direct Edge, received 47% of TD Ameritrade's limit orders, but only 1% of its market orders because it pays kickbacks for limit orders, but not market orders:



28. Likewise, in the second and third quarters of 2013, these same three firms paid kickbacks to TD Ameritrade to receive 95% of all limit orders for NYSE-listed securities. Similar to the fourth quarter of 2013, Direct Edge did not receive any of TD Ameritrade's market orders, but it did receive 45% of TD Ameritrade's limit orders:





**SEC Rule 606 Report**

## TD Ameritrade, Inc. Member FINRA/SIPC/NFA – Third Quarter 2013
(Percentages of Total Non-Directed Orders Routed to Individual Market Centers)

**Securities Listed on the NYSE Euronext**

| Routing Venue | Order Percentage Statistics | | | |
|---|---|---|---|---|
| | Total Orders (%) | Market Orders (%) | Limit Orders (%) | Other Orders (%) |
| Direct Edge | 38% | 0% | 45% | 1% |
| Citadel Execution Services | 37% | 64% | 32% | 62% |
| Citigroup | 20% | 30% | 18% | 33% |

29.     As Senator Levin stated, it is "hard to believe that [it] is a coincidence" that TD Ameritrade's "subjective judgment as to which trading venue provides best execution … always just happens to also result in the biggest payment" to TD Ameritrade.

30.     TD Ameritrade has made significant profits from its improper order routing practices.  In 2011, for example, Defendant earned $185 million in order routing revenue from kickbacks.  Similarly, in 2012, Defendant earned $184 million in order routing revenue.  And in 2013, Defendant earned $236 million in order routing revenue—almost 10% of TD Ameritrade's total revenue for 2013.  Moreover, Defendant is only increasing its revenues from its improper order routing practices.  In the first three quarters of the 2014 fiscal year, TD Ameritrade reported $226 million in order routing revenue.  Notably, these amounts are in addition to the commissions paid by TD Ameritrade's clients for its retail brokerage services.

31.     These order routing kickbacks are a valuable piece of TD Ameritrade's business.  When asked about the prospects for deriving order routing revenue, TD Ameritrade's Chief Financial Officer William Gerber told investors in April 2013, "So I think that the order flow is obviously very valuable."

32.     Studies conducted by Professors Robert H. Battalio, Shane A. Corwin, and Robert Jennings from the Mendoza College of Business at the University of Notre Dame and the Kelley

School of Business at Indiana University (the "Battalio Research"), into the order routing practices of TD Ameritrade and other brokers, provides further evidence that non-directed, standing limit order routing decisions made pursuant to kickback arrangements typically provide inferior execution relative to other trading venues. The Battalio Research found that "[f]our sample brokers, Ameritrade, E*Trade, Fidelity, and Scottrade, route orders in a way that suggests a focus on liquidity rebates." Consistent with the Battalio Research, limit orders routed to the trading venues offering higher kickbacks fill slower and less often than similar orders routed to trading venues offering lower kickbacks. When brokers like TD Ameritrade implemented programs designed to maximize their own profits through maximizing kickbacks, client orders were routed to venues where the orders were up to 25% less likely to be executed.

33.     There is a high correlation between the level of a trading venue's taker fee and its maker rebate. Thus, a trading venue such as Direct Edge, which offers a high kickback in the form of a rebate, also charges a high taker fee. The Battalio Research found that when identical orders were routed to two venues at the same time the venue offering lower kickbacks was more likely to fill the limit order, and—in instances where both venues filled the order—was far more likely to fill the order more quickly.

34.     Further, the Battalio Research analyzed market order execution across multiple venues when each of the venues was at the best price. The Battalio Research found that the data supported previous academic work finding that fees influenced the routing of orders to venues charging the lowest taker fee (i.e., venues unlike Direct Edge). In such instances, the limit order queue line for the venues offering the highest taker fee (and correspondingly, the highest kickback) was two to three times as long as the queue line for the venues charging the lowest taker fee and offering the lowest kickback. This explains why limit orders routed to the trading venues paying

the highest kickbacks take longer to be filled than limit orders routed to the trading venues paying the lowest kickbacks.  According to Professor Battalio, "the decision to route the bulk of one's limit orders to a single venue charging the maximum permissible take fee, and correspondingly offering high liquidity rebates, is inconsistent with a broker's fiduciary responsibility to obtain best execution."

35.      Finally, as reiterated in his written Senate testimony, Professor Battalio and his co-authors also concluded that limit orders sent to the trading venues with the highest taker fees (i.e., Direct Edge) will have lower fill rates and trade when the market price is becoming worse for the customer:

> All else equal, when two venues offer the best price, one expects liquidity demanders arriving in the marketplace to first route their orders to the venue with the lower take fee. Consider the case where two exchanges are at the national best bid. If sufficient selling demand arrives, sellers exhaust liquidity by walking down both exchange's limit order books. In this situation, all limit orders at the original bid price execute and all suffer a short-term loss. However, if the stock price rises before liquidity is exhausted at the national best bid, limit orders on the venue with the higher take fee (and thus, the higher make rebate) can become isolated, missing out on profitable trading opportunities. Thus, on average, we expect that limit orders sent to venues with high take fees will have lower fill rates and suffer greater adverse selection costs – they are more likely to trade when the price moves against them and less likely to trade when prices move in their favor. This suggests that brokers routing limit orders to venues with the highest take fees (and make rebates) may not be obtaining best execution for their clients.

36.      The Battalio Research demonstrates an impact of limit order routing decisions on limit order execution quality, such that "routing decisions based primarily on rebates/fees appear to be inconsistent with best execution.  There is a significant opportunity cost associated with routing all nonmarketable limit orders to a single venue offering the highest liquidity rebates."

37.      This action does not contend that maker kickbacks are per se unlawful or improper or that compensation for a maker rebate for a particular trade means the broker receiving the rebate

violated best execution.  This action also does not challenge TD Ameritrade's disclosure of maker kickbacks.

## CLASS ACTION ALLEGATIONS

38.      Plaintiff brings this case as a class action pursuant to Rules 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.  The proposed Class consists of all persons who placed a non-directed, standing limit order with TD Ameritrade that was executed until the date notice is disseminated to the Class.

39.      The Class excludes TD Ameritrade's officers and directors, current or former employees, as well as their immediate family members.

40.      ***Numerosity***.  The members of the Class are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains thousands of members.  While the precise number of Class members  is unknown to Plaintiff, it is known to Defendant.

41.      ***Existence and Predominance of Common Questions of Law and Fact***.  Common questions of law and fact exist as to all members of the Class and predominate over  any questions affecting only individual Class members.  All members of the Class have been  subject  to  the same  conduct  and  their claims  arise from the same legal claims.  The  common legal and factual questions include, but are not limited to, the following:

(a)      Whether TD Ameritrade has a duty of best execution to Plaintiff and members of the Class;

(b)      Whether TD Ameritrade has an obligation to obtain the most favorable terms reasonably available for the non-directed, standing limit orders placed by Plaintiff and members of the Class;

(c)     Whether TD Ameritrade has a policy or practice of receiving kickbacks in connection with placing the non-directed, standing limit orders made by Plaintiff and members of the Class;

(d)     Whether TD Ameritrade's policy or practice of choosing trading venues based on the kickbacks it would receive for the non-directed, standing limit orders made by Plaintiff and members of the Class breached the duty of best execution owed to Plaintiff and members of the Class;

(e)     Whether Nebraska law applies to the claims at issue as to Plaintiff and members of the Class;

(f)     Whether TD Ameritrade engaged in unlawful or unfair business practices;

(g)     Whether the Plaintiff and the Class are entitled to injunctive relief;

(h)     Whether the Plaintiff and the Class are entitled to declaratory relief;

(i)     Whether TD Ameritrade has been unjustly enriched by its improper course action;

(j)     Whether the commissions and kickbacks in the form of rebates, received by TD Ameritrade in connection with the non-directed, standing limit orders made by Plaintiff and the Class should be disgorged; and

(k)     Whether Plaintiff and members of the Class are entitled to equitable relief, and the proper measure of that equitable relief.

42.     *Typicality*. Plaintiff's claims are typical of the claims of the members of the Class in that Plaintiff is a member of the Class that he seeks to represent.

43.     ***Adequacy of Representation***. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in the

prosecution of this type of class action litigation. Plaintiff has no adverse or antagonistic interests to those of the Class.

44. ***Superiority***. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. The burden and expense that would be entailed by individual litigation makes it impracticable or impossible for Class members to prosecute their claims individually. Further, the adjudication of this action presents no unusual management difficulties.

45. Unless a class is certified, Defendant will retain monies received as a result of its improper conduct. Unless a class wide injunction is issued, Defendant will continue to commit the violations alleged, and will continue to violate its duties of best execution in connection with orders placed by members of the Class. TD Ameritrade has acted or refused to act on grounds that are generally applicable to the Class so that injunctive and declaratory relief is appropriate to the Class as a whole.

## COUNT I
## BREACH OF FIDUCIARY DUTY

46. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

47. TD Ameritrade owed fiduciary duties to Plaintiff and the Class, including duties of best execution.

48. Pursuant to its duty of best execution, TD Ameritrade was required to take into account material differences in execution quality among trading venues, including using reasonable diligence to ascertain the best trading venue so that the resultant price to Plaintiff and

the Class is as favorable as possible. By utilizing the order routing policies and practices described above, which included routing its customers' trades to the trading venues that paid TD Ameritrade kickbacks, TD Ameritrade breached its fiduciary duty owed to Plaintiff and the Class.

49.     TD Ameritrade has earned significant, wrongful monies and profits from these material and opportunistic breaches that have also caused the orders made by Plaintiff and the Class to be executed in a manner that did not fulfill best execution. TD Ameritrade's customers have been damaged thereby, in an amount to be determined at trial.

50.     As a result of TD Ameritrade's breach of fiduciary duty, Plaintiff and the Class are also entitled to an accounting and injunctive relief prohibiting TD Ameritrade from factoring kickbacks when performing best execution for non-directed, standing limit orders.

## COUNT II
## VIOLATIONS OF NEBRASKA'S CONSUMER PROTECTION ACT, NEB. REV. STAT. §§ 59-1601 *ET SEQ.*

51.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

52.     Plaintiff, on behalf of himself and the Class, brings this claim for violations of Nebraska's Consumer Protection Act pursuant to Nebraska Rev. Stat. §§59-1601, *et seq.* (the "NCPA").

53.     Pursuant to Nebraska Rev. Stat. §59-1602, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."

54.     TD Ameritrade's conduct at issue constitutes trade or commerce within the meaning of the NCPA. Plaintiff and members of the Class are persons within the meaning of the NCPA.

55.     TD Ameritrade's practices at issue have an impact not only on Plaintiff and the Class (including many persons within the state of Nebraska), but also the public interest, including

by maintaining transparency, fairness, and trust in the financial markets. In his opening remarks before the Investigations Subcommittee of the Senate Homeland Security and Governmental Affairs Committee subject on Conflicts of Interest, Investor Loss of Confidence, and High Speed Trading in U.S. Stock Markets, Senator Levin observed that "even Americans without a single share of stock or a mutual fund account have something at stake [when conflicts of interest are embedded in the financial market structure], because stock markets exist to foster investment growth and job creation. Conflicts of interest jeopardize that vital function."

56.     By failing to comply with its duties of best execution, including by routing the trades of Plaintiff and the Class to the trading venue that paid TD Ameritrade the highest kickback, TD Ameritrade has engaged in unfair methods of competition and unfair acts or practices in violation of the NCPA. Such conduct is substantially injurious to consumers, offends public policy and practice, violates established concepts of duty and fairness, and is immoral, unethical, oppressive, and unscrupulous. Further, TD Ameritrade continues to engage in this unfair conduct.

57.     Pursuant to the NCPA, Plaintiff and the Class are entitled to an injunction enjoining TD Ameritrade from continuing its unlawful conduct, including prohibiting TD Ameritrade from factoring liquidity kickbacks when performing best execution for non-directed, standing limit orders, or, in the alternative, TD Ameritrade should be required to pass-on the rebate payments it receives to its customers as a result of routing their non-directed, standing limit orders. Further, pursuant to Nebraska Rev. Stat. §59-1609, Plaintiff and the Class are entitled to actual damages, pray that the Court increase the award of damages, and seek to recover the costs of the suit, including reasonable attorney's fees.

## COUNT III
## UNJUST ENRICHMENT

58.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

59.     TD Ameritrade owes a duty of best execution to Plaintiff and the Class. Notwithstanding its duties, TD Ameritrade utilizes a uniform trade routing practice that is not in the best interest of its customers.  TD Ameritrade accepts trade commissions from Plaintiff and the Class for their orders, and thereby assumes a duty of best execution.  In derogation of its duties, TD Ameritrade routes its customers' orders to the trading venue that is willing to pay TD Ameritrade the most money to receive its non-directed, standing limit order flow.

60.     As the intended and expected result of its conscious wrongdoing as set forth in this Complaint, TD Ameritrade has profited and benefited from its improper market selection and order routing practices.  TD Ameritrade does not pass on the rebate payments that it receives for routing the orders of Plaintiff and Class members to particular trading venues.

61.     By its improper and wrongful conduct described herein, TD Ameritrade was and continues to be unjustly enriched at the expense of Plaintiff and the members of the Class.

62.     It would be inequitable for TD Ameritrade to retain the profits, benefits, and other compensation it obtained through its wrongful acts, including the commissions and kickbacks obtained in connection with routing the orders at issue.  Thus, a constructive trust should be imposed on all monies wrongfully obtained by TD Ameritrade.  Plaintiff and the Class are entitled in equity to seek restitution of these wrongful profits, revenues, and benefits to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy TD Ameritrade's unjust enrichment.

## COUNT IV
## DECLARATORY RELIEF

63.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

64.     A controversy has arisen and now exists between Plaintiff and Class members on the one hand and TD Ameritrade on the other.  The controversy between the parties concerns TD Ameritrade's automated trade-routing policy and practice and its duty of best execution owed in connection with the trade orders it routes on behalf of Plaintiff and the Class.  Plaintiff and Class members contend that by pre-determining where it will automatically route non-directed, standing limit orders in the aggregate based on maximizing the rebate payments it will receive, TD Ameritrade violates its duty of best execution, including because it fails to use reasonable diligence to ascertain the best trading venue so that the resultant price to the customer is as favorable as possible.  TD Ameritrade disputes these contentions and contends that it does not violate its duty of best execution by taking into account potential for rebate payments when routing its customers' orders.

65.     Plaintiff requests a judicial determination of his rights and duties, and the rights and duties of absent Class members and a declaration as to whether TD Ameritrade's order routing practice breaches the duty of best execution owed to Plaintiff and Class members.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief in interim orders and by way of entry of final judgment in his favor, in favor of those he seeks to represent, and against Defendant:

A.     Certifying this action as a class action and appointing Plaintiff as class representative and his counsel as class counsel;

       B.      Awarding declaratory and injunctive relief as permitted by law or equity, including a judicial determination of the parties' rights and duties, enjoining TD Ameritrade from continuing the unlawful practices as set forth herein (including the improper order routing practices), imposing a constructive trust on all monies wrongfully obtained by TD Ameritrade, and directing TD Ameritrade to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendant by means of any act or practice declared by this Court to be wrongful;

       C.      Awarding attorney's fees and costs; and

       D.      Granting Plaintiff and the Class such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues which are subject to adjudication by a trier of fact.

Dated: October 23, 2014

                        BRUCE LERNER, on Behalf of Himself and All Others Similarly Situated, Plaintiff

            By:     s/s James R. Welsh_____
                     James R. Welsh, #14459
                     Christopher P. Welsh #2279
                     WELSH & WELSH PC, LLO
                     9290 West Dodge Road
                     204 The Mark
                     Omaha, NE 68114
                     Tele:   402.384.8160
                     Fax:    402.384.8211
                     jwelsh@welsh-law.com
                     cwelsh@welsh-law.com

and     Brian J. Robbins (*Pro Hac Vice* pending)
             ROBBINS ARROYO LLP
             AOC
             600 B Street, Suite 1900
             San Diego, CA 92101
             Tele:   619.525.3990
             Fax:    619-525-3991
             brobbins@robbinsarroyo.com

and     Timothy G. Blood (*Pro Hac Vice* pending)
             Thomas J. O'Reardon II (*Pro Hac Vice* pending)
             BLOOD HURST & O'REARDON, LLP
             701 B Street, Suite 1700
             San Diego, CA 92101
             Tele:   619.338.1100
             Fax:    619.338.1101
             tblood@bholaw.com
             toreardon@bholaw.com

             ATTORNEYS FOR PLAINTIFF

{00077799.V1}